RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED 4
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. M
DATE 1-26-04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUNE E. PATENAUDE, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH and RONALD F. RICHARDS, | **JURY TRIAL DEMANDED** |
| Defendants. | 04  10179 NG |

MAGISTRATE JUDGE _____

Plaintiff, June E. Patenaude, individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through her attorneys, which included, among other things, a review of public documents and announcements made by the defendants, Securities and Exchange Commission ("SEC") filings, and press releases regarding Biopure Corporation ("Biopure" or the "Company"), and plaintiff's belief that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal class action brought by plaintiff on behalf of herself and a Class (defined in paragraph 40, below) consisting of all other persons and entities who purchased Biopure common stock during the period from March 17, 2003 through December 24, 2003 (the "Class Period"), to recover damages caused by the defendants' violation of federal securities laws. During the Class Period, the defendants issued numerous positive statements concerning

the progress of its application to the U.S. Food and Drug Administration ("FDA") seeking regulatory approval to market Hemopure in the United States for patients undergoing orthopedic surgery. By the beginning of the Class Period, the FDA had informed Biopure and the defendants of flaws in the Hemopure application, citing "safety concerns" arising from adverse clinical data submitted as part of the Company's application to the FDA, making approval highly unlikely.

2. On December 24, 2003, under the threat of civil litigation by the SEC, the defendants announced that the FDA had halted further clinical trials of Hemopure due to safety concerns and disclosed that the commercial release of Hemopure in the United States would be delayed beyond mid-2004.

3. On December 26, 2003, Biopure common stock lost over 16% of its value to close at $2.43 per share, a decline of more than 239% from a Class Period high of $8.25 per share.

### JURISDICTION AND VENUE

4. The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

5. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. § 1331.

6. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in substantial

part in this District. Moreover, the Company's principal place of business is located in this District.

7. In connection with the acts, transactions and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

8. Plaintiff, June E. Patenaude, purchased shares of Biopure common stock during the Class Period as detailed in the attached Certification and has been damaged thereby.

9. Defendant Biopure maintains its principal executive offices at 11 Hurley Street, Cambridge, Massachusetts 02141. Biopure purportedly develops, manufactures and markets oxygen therapeutics, for both humans and veterinary use, designed to serve as an alternative to red blood cell transfusions and for use in the treatment of other critical care conditions. The Company has developed and manufactures two products: Hemopure-hemoglobin glutamer-250 (bovine), or HBOC-201-for human use, and Oxyglobin-hemoglobin glutamer - 200 (bovine), or HBOC-301-for veterinary use.

10. Defendant Thomas A. Moore ("Moore"), at all relevant times to this action, served as the Company's President and Chief Executive Officer.

11. Defendant Carl W. Rausch ("Rausch"), at all relevant times to this action, served as the Company's Vice Chairman and Chief Technology Officer.

12. Defendant Ronald F. Richards ("Richards") at all relevant times to this action, served as the Company's Chief Financial Officer.

13. Defendants Moore, Rausch and Richards are collectively referred to hereafter as the "Individual Defendants".

14. By reason of their management positions, and/or membership on Biopure's Board of Directors, and their ability to make public statements in the name of Biopure, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Biopure to engage in the unlawful conduct complained of herein.

15. By reason of their positions with the Company, the Individual Defendants had access to internal Company documents, reports and other information, including the adverse non-public information concerning the Company's financial condition and business, and attended management and/or board of directors meetings. The Individual Defendants were responsible for the truthfulness and accuracy of the Company's public filings and press releases described herein.

16. Biopure, and the Individual Defendants as officers and directors of a publicly-held company, had a duty to promptly disseminate truthful and accurate information with respect to Biopure and to promptly correct any public filings or statements issued by or on behalf of the Company which had become false or misleading.

17. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Biopure common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Biopure's business, operations, management and the intrinsic value of Biopure common stock, allowed the Company to sell its common shares generating more than $36 million in proceeds and enabled Defendant Rausch to

sell nearly $1.6 million worth of her personally-held shares of Biopure common stock at artificially inflated prices.

18. Each of the defendants knew or recklessly disregarded that the false and/or misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's stock and would cause the price of the Company's common stock to become artificially inflated. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

## SUBSTANTIVE ALLEGATIONS

19. On July 31, 2002, Biopure submitted a biologic license application ("BLA") to the FDA seeking regulatory approval to market Hemopure in the United States for patients undergoing orthopedic surgery. In September 2002, the Company received a grant from the U.S. Department of the Army for the purpose of conducting clinical trials of Hemopure for the treatment of certain trauma patients. According the Company's fiscal 2002 Form 10-K filed with the SEC, "[t]she Company has identified trauma as its next clinical development priority and is working with a committee of independent civilian and military trauma experts to broaden its trauma program."

20. Unknown to shareholders, in March 2003, Biopure submitted a "trauma study protocol" to the FDA, in connection with the Company's plans to conduct a "[p]hase II clinical trial" of Hemopure for the treatment of trauma patients. Immediately afterwards, the FDA informed the defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse clinical data submitted as part of Biopure's July 2002 BLA seeking FDA approval to market Hemopure to orthopedic surgery patients. This had the effect

of putting the defendants on notice that the FDA approval of the BLA, which would allow the first commercial distribution of Hemopure in the United States, was in doubt and would be delayed beyond the time period previously communicated by Biopure to the investing community. Throughout the Class Period, defendants failed to disclose any of these adverse facts to the investing community. Biopure's statements regarding Hemopure during the Class Period, materially misled investors concerning the commercial viability of Hemopure and the expected commencement of its commercial release in the United States. During the Class Period, defendants conducted at least two offerings of Biopure common stock generating millions of dollars in proceeds. Certain Biopure insiders, including defendants Moore and Rausch, sold hundreds of thousands of shares in Biopure common stock to the investing public at artificially inflated prices.

21. On March 17, 2003, the beginning of the Class Period, Biopure filed its Form 10-Q with the SEC for the period ending January 31, 2003 (the "January 2003 10-Q"). The 10-Q stated that Biopure had a net loss of $0.36 per share during the first quarter of fiscal 2003 compared to a net loss of $0.38 for the same period last year. The 10-Q included representations concerning Biopure's Hemopure research and development efforts. The 10-Q stated in relevant part:

> Research and development expenses continue to include amounts for support of the BLA review process including responding to FDA inquiries, preparing for and participating in FDA inspections of facilities and documentation and preparing for a possible FDA Advisory Panel presentation. These BLA support costs were $2,232,000 for the first fiscal quarter of 2003 and are expected to continue at approximately the same level until the middle of this calendar year, when the company is hopeful that it will receive action by the FDA on the BLA.
>
> ***
>
> If the FDA were to grant marketing approval for Hemopure this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004. We do not anticipate that we will attain profitability, however, until we are able to

increase our manufacturing capacity. These are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure.

22. On March 25, 2003, Biopure announced, via a press release, that it has raised $13.4 million in gross proceeds through the completion of a public offering of 5,548,480 shares of its common stock at $2.42 per share. This press release stated in relevant part:

> Biopure sold all of these shares to a group of investors under a shelf registration statement previously filed with and declared effective by the U.S. Securities and Exchange Commission. Investors included Biopure Vice Chairman David N. Judelson, President and CEO Thomas A. Moore and a major stockholder, HTV Industries, Inc., and its affiliates, who purchased an aggregate of $2.3 million of stock. The company also issued the group of investors warrants to purchase an aggregate of 1,109,696 shares of common stock at $3.63 per share, which if exercised would provide Biopure with additional net proceeds of approximately $4.0 million.
>
> Biopure had 30,875,563 million shares outstanding and $9.5 million in cash and cash equivalents as of the close of the first fiscal quarter on January 31, 2003.
>
> \*\*\*
>
> Biopure Corporation, headquarter in Cambridge, Mass., is a leading developer, manufacturer and marketer of oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to delivery oxygen to the body's tissues. Hemopure [hemoglobin glumater - 250 (bovine)] is approved in South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose of eliminating or reducing the need for allogenic red blood cell transfusion in these patients. Biopure's application to market Hemopure in the United States for a similar indication in adult patients undergoing elective orthopedic surgery is currently being reviewed by the U.S. Food and Drug Adminstration [...]

23. The statements referenced above in ¶22 were materially false and misleading when made because they failed to disclose certain existing material facts, including: (a) that the Company and defendants had been notified by the FDA, as early as March 2003 that Biopure's clinical trials of Hemopure for trauma applications had been suspended due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA

for Hemopure orthopedic applications; (b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and could not have occurred any earlier than late 2004; and (c) based on the foregoing, the defendants' opinions, projections and forecasts concerning Biopure's financial condition and its operations were lacking in a reasonable basis at all relevant times.

24. On May 22, 2003, Biopure announced via press release its financial results for the second fiscal quarter ended April 30, 2003. For the quarter, Biopure reported a net loss of $0.35 per common share, compared with a net loss of $0.49 per common share, for the corresponding period in fiscal 2002. Regarding the FDA's pending approval of Biopure's Hemopure BLA, the release stated in relevant part:

> **Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biologic license application (BLA) to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery.** As part of this review, the agency has inspected the company's manufacturing and data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa. Biopure has responded to all questions raised by the FDA to date. [Emphasis added].

25. The statements referenced above in ¶24 were materially false and misleading when made because they failed to disclose certain existing material facts, including: (a) that the Company and defendants had been notified by the FDA, as early as March 2003 that Biopure's clinical trials of Hemopure for trauma applications had been suspended due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA for Hemopure orthopedic applications; (b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and could not have occurred any earlier than late 2004; and (c) based on the foregoing, the defendants' opinions, projections

and forecasts concerning Biopure's financial condition and its operations were lacking in a reasonable basis at all relevant times.

26. On May 30, 2003, Biopure announced via press release that the FDA had notified the Company that it will complete its review and act on the BLA for Hemopure by August 29, 2003. In addition, defendant Moore commented on the FDA's review process as follows:

> **We're very please with the FDA's progress in reviewing our application[.]
> We continue to work closely with the agency toward a final decision that will
> allow us to make Hemopure available as an alternative to red blood cell
> transfusion.** We're also continuing our preparations to roll out the product to
> leading orthopedic surgery centers following approval. [Emphasis added]

27. The statements referenced above in ¶26 were materially false and misleading when made because they failed to disclose certain existing material facts, including: (a) that the Company and defendants had been notified by the FDA, as early as March 2003 that Biopure's clinical trials of Hemopure for trauma applications had been suspended due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA for Hemopure orthopedic applications; (b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and could not have occurred any earlier than late 2004; and (c) based on the foregoing, the defendants' opinions, projections and forecasts concerning Biopure's financial condition and its operations were lacking in a reasonable basis at all relevant times.

28. On June 16, 2003, Biopure filed a Form 10-Q for the period ended April 30, 2003, (the "April 2003 10-Q") with the SEC confirming the Company's results stated in ¶24. The April 2003 10-Q also stated in relevant part:

> Research and development expenses include product and process development
> and engineering, pre-clinical studies, clinical trials, clinical trial materials and,

through May 2002, an allocation of unabsorbed fixed costs of manufacturing. Our research and development expenses have continued to be primarily for our one major project - Hemopure development for use in patients undergoing surgery.

The completed Phase III orthopedic surgery trial cost approximately $37,000,000 over the four years from protocol development to final report. These trial costs include costs incurred at nearly 50 hospitals, trial site monitoring, data management, regulatory consulting, statistical analysis, medical writing and clinical materials and supplies as well as Company personnel engaged in these activities. Costs incurred in filing the BLA include Company personnel and payments to third parties for manufacturing process documentation, medical consultants, regulatory consultants, integrating the safety and efficacy databases for all clinical trials and pre-clinical studies. Research and development expenses continue to include amounts for support of the BLA review process. These BLA support costs were $2,339,000 for the second fiscal quarter of 2003 and are expected to continue at approximately the same level until August 29, 2003, when the Company expects the FDA to act on the BLA. If the FDA were to grant a marketing license at that time, this major project could be substantially complete for orthopedic surgery. Further, any FDA action in August could consist of requests for additional information rather than product approval, including a requirement to conduct additional pre-clinical or clinical trials. Moreover, an approval could be conditioned on the Company's agreement to conduct a "Phase IV", or post-marketing trial to collect additional data. Consequently, the amount of further expenditures on this major project after an FDA response cannot be estimated until we receive the response.

If the FDA grants marketing approval for Hemopure this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004. We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure.

29.  On July 23, 2003, Biopure announced via press release that it has raised $17.2 million in total proceeds through the sale of 3,083,000 shares of the company's common stock.

30.  On August 21, 2003, Biopure announced, via a press release, its financial results for the third fiscal quarter ended July 31, 2003. For the quarter, Biopure reported a net loss of $0.28 per common share, compared with a net loss of $0.43 per common share, for the

corresponding period in fiscal 2002. The press release included statements concerning the FDA's review of Biopure's Hemopure BLA. The release stated in relevant part:

> On July 30th, the FDA sent Biopure a letter stating that the agency has completed its review of the company's BLA to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The letter requests additional information and suspends the BLA review clock with 30 days remaining in the original review cycle. It does not request additional clinical trials.

31.  On September 15, 2003, Biopure filed a Form 10-Q for the quarter ended July 31, 2003 (the "July 2003 10-Q"), with the SEC, confirming the Company's financial results as stated in ¶30. The July 2003 10-Q also stated, in relevant part:

> **We anticipate material revenues from this project within one year if the FDA grants marketing approval for Hemopure.** We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure. [Emphasis Added]
>
> Research and development expenses were $2,380,000 for the third quarter of fiscal 2003, compared to $7,063,000 for the same period in fiscal 2002. Of the expenses for the third quarter of fiscal 2003, $2,170,000 were for BLA support costs and the balance for various expenditures not allocable to any major project. In the corresponding quarter of fiscal 2002, expenditures included $5,003,000 for BLA filing preparation, $854,000 for data organization and analyses for the Phase III orthopedic surgery trial of Hemopure and $1,006,000 in unabsorbed fixed manufacturing costs.

32.  The statements referenced above in ¶¶30-31 were materially false and misleading when made because they failed to disclose certain existing material facts, including: (a) that the Company and defendants had been notified by the FDA, as early as March 2003 that Biopure's clinical trials of Hemopure for trauma applications had been suspended due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA

for Hemopure orthopedic applications; (b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and could not have occurred any earlier than late 2004; and (c) based on the foregoing, the defendants' opinions, projections and forecasts concerning Biopure's financial condition and its operations were lacking in a reasonable basis at all relevant times.

33.     On October 30, 2003, Biopure announced, via a press release, its plan to respond by June 30, 2004, to the FDA's inquiry regarding the company's BLA for Hemopure. The press release stated that Biopure had adjusted its operating plan to reduce expenses and conserve cash while it completes its response to the FDA. The press release stated in relevant part:

> Biopure Corporation today announced its plan to respond by June 30, 2004, to the Food and Drug Adminstration's questions regarding its biologic license application (BLA) for Hemopure ® [hemoglobin glumater-250(bovine)]. The company has adjusted its operating plan to reduce expenses and conserve cash while it completes its written response to the FDA.
>
> Biopure applied for FDA approval to market the company's oxygen therapeutic, Hemopure, in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients.
>
> During the past two months the company has had several substantive interactions with the FDA to clarify the Agency's questions. Many of Biopure's responses have been completed. However, some require the retrieval of source medial documents and/or historical blood transfusion data from clinical trial sites in various countries, which will take several months to complete.
>
> ***
>
> Biopure has also implemented cost reductions designed to minimize its ongoing cash burn, which include reducing the workforce by approximately 30 percent and decreasing forecast manufacturing expenses for fiscal 2004. These measures represent overall anticipated savings of approximately $12 million in fiscal 2004, despite higher costs associated with FDA response activities. The company is in the process of renewing a standby equity distribution agreement to provide up to $15 million as needed.
>
> ***

Defendant Moore added in relevant part:

> In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions," said Biopure President and CEO Thomas A. Mooore. "We view the Agency's questions as a 'roadmap' to approval and have set a conservative, achievable target date for our response. We remain enthusiastically committed to commercializing Hemopure in the Untied States as expeditiously as possible.

34.     The statements referenced above in ¶33 were materially false and misleading when made because they failed to disclose certain existing material facts, including: (a) that the Company and defendants had been notified by the FDA, as early as March 2003 that Biopure's clinical trials of Hemopure for trauma applications had been suspended due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA for Hemopure orthopedic applications; (b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and could not have occurred any earlier than late 2004; and (c) based on the foregoing, the defendants' opinions, projections and forecasts concerning Biopure's financial condition and its operations were lacking in a reasonable basis at all relevant times.

35.     On December 24, 2003, after the close of the stock market, Biopure announced via a press release that it received a "Wells Notice" from the staff of the SEC on December 22, 2003, indicating the staff's preliminary decision to recommend that the SEC bring civil injunctive proceedings against Biopure relating to the defendant's disclosures concerning its communications with the FDA about a trauma study protocol the company submitted to the FDA in March 2003 and about the Company's BLA for Hemopure. The Company also stated that regulatory approval of the Hemopure BLA would be postponed, at a minimum, until the second half of 2004. The press release stated in relevant part:

> Biopure Corporation reported that on December 22, 2003, it received a "Wells

Notice" from the staff of the Securities and Exchange Commission (SEC) indicating the staff's preliminary decision to recommend that the SEC bring a civil injunctive proceeding against the company. As permitted under the Wells process, Biopure intends to respond promptly and thoroughly in writing before the SEC staff formally decides what action, if any, to recommend. The company's chief executive officer and its former senior vice president of Regulatory and Operations also received Wells Notices.

Biopure believes the notices relate to the company's disclosures concerning its communications with the Food and Drug Administration (FDA) about a trauma study protocol the company submitted to the Agency in March 2003 and about the company's biologics license application (BLA) for Hemopure (R)[hemoglobin-glutamer-250(bovine)]. The company did not publicly disclose its communications with the FDA about the proposed trauma protocol and investigational new drug application (IND) because it does not believe communications about proposed clinical trials are material prior to the initiation of a trial. This trauma trial was not initiated in the United States and no product was shipped under this IND. Biopure also believes that its disclosures about the BLA are accurate. The company will continue to cooperate with the SEC staff.

Biopure submitted the trauma protocol for a Phase II clinical trial of Hemopure for the treatment of hemorrhagic shock casualties in the hospital setting, where red blood cell transfusions are available. The FDA placed this trauma protocol under a new IND that is separate from the company's previous IND and its BLA to market Hemopure for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The protocol sought to administer up to 15 units of Hemopure, a proposed dosage that was 50 percent higher than administered in previous clinical trials.

After the in-hospital trauma protocol was submitted to the FDA and the new IND was assigned, the Agency placed a clinical hold on a proposed trauma trial due to safety concerns. The FDA referred to a review of adverse event data from the company's Phase III orthopedic surgery trial, which was submitted in the BLA. The data from that Phase III trial has been previously presented at medical meetings.

In May 2003, Biopure responded to the FDA's clinical hold and also filed the response as a BLA amendment because it discussed data previously submitted with the BLA. That amendment resulted in the FDA extending its BLA review period up to 90 days, as previously announced on May 30, 2003. The Agency also requested three additional pre-clinical animal studies of Hemopure in conscious swine to address its concerns regarding high-volume administration. After the company's response, the FDA has twice declined to lift the clinical hold, most recently in a letter dated July 30, 2003. This letter is separate from the FDA complete response letter Biopure received on that date in response in to its BLA for orthopedic surgery. The questions in the FDA's trauma letter were the same as some of the questions in the BLA complete response letter and had two additional questions, one about the company's analysis of age-specific effects in

individuals over age 75 in the Phase II orthopedic surgery trial and a second question about dosing.

A Biopure-requested meeting has been schedule with the FDA on January 6, 2004, to discuss the BLA. If there are significant developments at or following this meeting, the company intends to report them promptly. Biopure still expects to respond to the questions in the FDA's complete response letter by June 30, 2004.

36. On December 26, 2003, the first day of trading following the Company's announcements, the price of Biopure common stock shares fell over 16% in value to close at $2.43 per share.

37. On January 8, 2004, Biopure announced via press release the results of the Company's January 6, 2004 meeting with the FDA. During that meeting, the FDA expressed additional concern with the safety and efficacy of Hemopure. The release stated in relevant part:

> During the meeting the FDA expressed concerns about the current BLA based on safety and efficacy questions, beyond those cited in the complete response letter, arising from the Phase III orthopedic surgery trial. The Agency agreed to a continuing dialogue on these and other aspects of the BLA through meetings in advance of the company's planed reply to the complete response letter. Biopure continues to believe Hemopure is both safe and effective for the indication described in the BLA.
>
> The FDA asked Biopure to provide, for its evaluation of the BLA, the results of three previously requested preclinical studies. The FDA said that these studies are also a prerequisite for further U.S. clinical trials. Biopure has already submitted the protocols for these preclinical studies, and the Agency agreed to review them promptly. The studies are designed to assess the product's effect on tissue perfusion, tissue oxygenation and volume hemodynamics (colloidal effect) at high dosages (up to 70 percent blood replacement) in conscious swine. The company believes it can complete these animal studies within approximately six months after the FDA and the company agree on the protocols.
>
> Following its review of these preclinical studies and Biopure's responses to the issues raised by the FDA in its complete response letter and during the January 6th meeting, the FDA will determine whether additional human clinical trials are required.

## SCIENTER

38. The facts alleged herein, compel a strong inference that the defendants made materially false and misleading statements to the investing public with scienter in that the defendants knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. Moreover, the Individual Defendants caused Biopure to engage in irregular accounting practices, and in turn caused Biopure to report artificially inflated financial results. The Individual Defendants engaged in such a scheme to inflate the price of Biopure common stock in order to protect and enhance their executive positions.

39. While defendants were issuing false and misleading statements about the Company and its business, Biopure completed two offerings of its common stock totaling over $30.6 million in proceeds. Defendant Rausch directly or indirectly, disposed of nearly $1.6 million worth of personally-held Company stock, benefiting from the artificial inflation in Biopure's stock price. Defendant Rausch sold shares during the Class Period as follows:

| NAME | DATE | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| Carl W. Rausch (CTO) | 4/15/03 | 30,000 | $3.13 | $93,900 |
| | 6/5/03 | 2,000 | $6.06-$6.07 | $12,000 |
| | 6/24/03 | 3,000 | $5.58-$5.698 | $17,000 |
| | 6/25/03 | 2,700 | $5.80-$5.97 | $16,000 |
| | 6/26/03 | 34,374 | $5.80-$5.90 | $201,000 |
| | 6/27/03 | 20,000 | $5.95-$6.00 | $120,000 |
| | 6/30/03 | 5,000 | $6.14-$6.16 | $31,000 |
| | 8/5/03 | 10,000 | $7.50-$7.53 | $75,000 |
| | 8/6/03 | 2,000 | $7.50-$7.54 | $15,000 |
| | 8/7/03 | 8,000 | $7.00 | $56,000 |
| | 8/8/03 | 10,000 | $7.05-$7.28 | $72,000 |

|  | 8/12/03 | 10,000 | $7.00-$7.15 | $71,000 |
|---|---|---|---|---|
|  | 8/13/03 | 9,500 | $7.02-$7.15 | $67,000 |
|  | 8/28/03 | 100,000 | $7.50 | $750,000 |
| TOTAL PROCEEDS FOR RAUSCH: |  |  |  | $1,596,900 |

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons and entities who purchased Biopure common stock during the Class Period, and who suffered damages as a result of defendants improper conduct. Excluded are the defendants, any entity in which the defendants have a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the defendants.

41.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, thousands of members of the Class who traded during the Class Period.

42.     Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

        b)    whether the Company issued false and misleading financial statements during the Class Period;

        c)    whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

       d)      whether the market prices of the Company's stock during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

       e)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43. Plaintiffs claims are typical of the claims of the members of the Class as plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

44. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

46. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine in that:

       a)      defendants made public misrepresentations or failed to disclose material facts during the Class Period;

       b)      such omissions and misrepresentations were material;

       c)      the common stock of the Company traded in an efficient market;

    d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

    e)    plaintiff and the other members of the Class purchased Biopure common stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

47.    The market for Biopure common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Biopure common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Biopure common stock relying upon the integrity of the market price of Biopure common stock and market information relating to Biopure, and have been damaged thereby.

48.    Based upon the factors set forth in the preceding paragraph, plaintiff and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## NO SAFE HARBOR

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does not apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who know that those statements were false when made.

## COUNT I
### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 BROUGHT AGAINST ALL DEFENDANTS

50. Plaintiff repeats and reiterates each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

51. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Biopure common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

52. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Biopure's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Biopure and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members